JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

FRANK KWANING

## DEFENDANTS

COMMUNITY EDUCATION CENTERS, INC. (a/k/a GEORGE W. HILL CORRECTION FACILITY OR DELAWARE COUNTY PRISON

(b) County of Residence of First Listed Plaintiff   Delaware, PA

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Essex, NJ

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Stewart C. Crawford, Jr., Esquire,
55 North Lansdowne Avenue, Lansdowne, PA 19050

Attorneys (If Known)
John P. Gonzales, Esquire, 2000 Market Street, 23rd Floor,
Phila., PA 19103

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff

(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☒ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C §185(a), 28 U.S.C. Section 1332

Brief description of cause:
Section 301 of the Labor Management Relations Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   02/24/2015

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA – DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff      4940 State Road, Drexel Hill, Pennsylvania 19026

Address of Defendant      35 Fairfield Place, West Caldwell, NJ 07006

Place of Accident, Incident or Transaction      500 Cheney Road, Thornton, PA 19373

*(Use Reverse Side for Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

   (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))      Yes ☐   No ☒

Does this case involve multidistrict litigation possibilities?      Yes ☐   No ☒

*RELATED CASE, IF ANY:*

Case Number: _____    Judge _____    Date Terminated _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

     Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?

     Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier number case pending or within one year previously terminated action in this court?

     Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?

     Yes ☐   No ☒

**CIVIL:** (Place ✓ in ONE CATEGORY ONLY)

| A. | *Federal Question Cases:* | B. | *Diversity Jurisdiction Cases* |
|---|---|---|---|
| 1. ☐ | Indemnity Contract, Marine Contract, and All Other Contracts | 1. ☐ | Insurance Contract and Other Contracts |
| 2. ☐ | FELA | 2. ☐ | Airplane Personal Injury |
| 3. ☐ | Jones Act-Personal Injury | 3. ☐ | Assault, Defamation |
| 4. ☐ | Antitrust | 4. ☐ | Marine Personal Injury |
| 5. ☐ | Patent | 5. ☐ | Motor Vehicle Personal Injury |
| 6. ☒ | Labor-Management Relations | 6. ☐ | Other Personal Injury (Please specify) |
| 7. ☐ | Civil Rights | 7. ☐ | Products Liability |
| 8. ☐ | Habeas Corpus | 8. ☐ | Products Liability – Asbestos |
| 9. ☐ | Securities Act(s) Cases | 9. ☐ | All other Diversity Cases |
| 10. ☐ | Social Security Review Cases | | (Please specify) |
| 11. ☐ | All other Federal Question Cases | | |
| | (Please specify) | | |

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, John P. Gonzales, counsel of record do hereby certify:

☐   Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐   Relief other than monetary damages is sought.

DATE   2/24/15 _____      John P. Gonzales, Esquire _____      71265 _____
                                     Attorney-at-Law                             Attorney I.D. #

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE   2/24/15 _____      John P. Gonzales, Esquire _____      71265 _____
                                       Attorney-at-Law                             Attorney I.D. #

CIV. 609 (6/08)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK KWANING | : | |
| | : | |
| vs. | : | Civil Action No. |
| | : | |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. (a/k/a GEORGE W. | : | |
| HILL CORRECTIONAL FACILITY or | : | |
| DELAWARE COUNTY PRISON) | : | |

| | | |
|---|---|---|
| FRANK KWANING | : | COURT OF COMMON PLEAS |
| | : | DELAWARE COUNTY |
| vs. | : | |
| | : | Civil Action No. 15-887 |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. (a/k/a GEORGE W. | : | |
| HILL CORRECTIONAL FACILITY or | : | |
| DELAWARE COUNTY PRISON) | : | |

## DISCLOSURE STATEMENT FORM

Please check one box:

__X__    The nongovernmental corporate party, Commununity Education Centers, Inc., d/b/a George W. Hill Correctional Facility, Delaware County Prison, in the above listed civil action does not have any parent corporation and publicly held corporation that owns 10% or more of its stock.

_____    The nongovernmental corporate party, _____, in the above listed civil action has the following parent corporation(s) and publicly held corporation(s) that owns 10% or more of its stock:

_____

February 24, 2015                         s/ John P. Gonzales  JG847
Date                                             Signature
                                                  Counsel for:   Community Education Centers, Inc.
                                                  d/b/a George W. Hill Correctional Facility, Delaware
                                                  County Prison

**Federal Rule of Civil Procedure 7.1 Disclosure Statement**
    (a) WHO MUST FILE:  A nongovernmental corporate party must file two copies of a disclosure statement that:
        (1)    identifies any parent corporation and any publicly held corporation owning 10% or more of its stock; or
        (2)    states that there is no such corporation.
    (b) TIME FOR FILING; SUPPLEMENTAL FILING. A party must:
    (1)    file the disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court; and
    (2)    promptly file a supplemental statement if any required information changes.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK KWANING | : | |
| | : | |
| vs. | : | Civil Action No. |
| | : | |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. (a/k/a GEORGE W. | : | |
| HILL CORRECTIONAL FACILITY or | : | |
| DELAWARE COUNTY PRISON) | : | |

| | | |
|---|---|---|
| FRANK KWANING | : | COURT OF COMMON PLEAS |
| | : | DELAWARE COUNTY |
| vs. | : | |
| | : | Civil Action No. 15-887 |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. (a/k/a GEORGE W. | : | |
| HILL CORRECTIONAL FACILITY or | : | |
| DELAWARE COUNTY PRISON) | : | |

## DISCLOSURE STATEMENT FORM

Please check one box:

___X___    The nongovernmental corporate party, Commununity Education Centers, Inc., d/b/a George W. Hill Correctional Facility, Delaware County Prison, in the above listed civil action does not have any parent corporation and publicly held corporation that owns 10% or more of its stock.

_____    The nongovernmental corporate party, _____, in the above listed civil action has the following parent corporation(s) and publicly held corporation(s) that owns 10% or more of its stock:

_____

February 24, 2015                    s/ John P. Gonzales  JG847_____
Date                                 Signature
                                     Counsel for:   Community Education Centers, Inc.
                                     d/b/a George W. Hill Correctional Facility, Delaware
                                     County Prison

**Federal Rule of Civil Procedure 7.1 Disclosure Statement**
(a) WHO MUST FILE:  A nongovernmental corporate party must file two copies of a disclosure statement that:
    (1)    identifies any parent corporation and any publicly held corporation owning 10% or more of its stock; or
    (2)    states that there is no such corporation.
(b) TIME FOR FILING; SUPPLEMENTAL FILING. A party must:
    (1)    file the disclosure statement with its first appearance, pleading, petition,
        motion, response, or other request addressed to the court; and
    (2)    promptly file a supplemental statement if any required information changes.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


# CASE MANAGEMENT TRACK DESIGNATION FORM

FRANK KWANING

v.                                                        CIVIL ACTION NO.:

COMMUNITY EDUCATION CENTERS,

INC. (a/k/a GEORGE W. HILL

CORRECTIONAL FACILITY or

DELAWARE COUNTY PRISON


In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.


**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)    Habeas Corpus-Cases brought under 28 U.S.C. §2241 through §2255.                ( )

(b)    Social Security-Cases requesting review of a decision of the Secretary of Health
       and Human Services denying plaintiff Social Security Benefits.                  ( )

(c)    Arbitration-Cases require to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d)    Asbestos-Cases involving claims for personal injury or property damage from
       exposure to asbestos.                                                           ( )

(e)    Special Management-Cases that do not fall into tracks (a) through (d) that are
       commonly referred to as complex and that need special or intense management by
       the court.  (See reverse side of this form for a detailed explanation of special
       management cases.)                                                              ( )

(f)    Standard Management--Cases that do not fall into any one of the other tracks.    (X)


February 24, 2015                                              Defendant, Community
_____        _____    Education Centers, Inc.
Date                              Attorney-at-law              _____
                                  John P. Gonzales, Esquire    Attorney for


                                                              jpgonzales@mdwcg.com
(215) 575-2871                    (215) 575-0856              _____
_____        _____
Telephone                         FAX Number                  E-Mail Address


(Civ. 660)  10/02

Civil Justice Expense and Delay Reduction Plan

**Section 1:03 - Assignment to a Management Track**

(a)    The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)    In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management of Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)    The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)    Nothing in this Plan is intended to abrogate of limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)    Nothing in this Plan is intended to supersede Local Civil Rules 3 or 7, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See § 1.02(e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions of potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

551629

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK KWANING                          :
                                       :
            vs.                        :       Civil Action No.
                                       :
COMMUNITY EDUCATION                    :
CENTERS, INC. (a/k/a GEORGE W.         :
HILL CORRECTIONAL FACILITY or          :
DELAWARE COUNTY PRISON)                :

---

FRANK KWANING                          :       COURT OF COMMON PLEAS
                                       :       DELAWARE COUNTY
            vs.                        :
                                       :       Civil Action No. 15-887
COMMUNITY EDUCATION                    :
CENTERS, INC. (a/k/a GEORGE W.         :
HILL CORRECTIONAL FACILITY or          :
DELAWARE COUNTY PRISON)                :

---

### NOTICE OF REMOVAL

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA:

Defendant, Community Education Centers, Inc., by and through its attorneys, Marshall Dennehey Warner Coleman & Goggin, hereby removes the above-captioned case to this Honorable Court and provides notice of same to counsel representing the Plaintiff. In support of the removal, Defendant avers as follows:

1.      On January 30, 2015, Plaintiff, Frank Kwaning filed a complaint in the Court of Common Pleas of Delaware County, Pennsylvania against Defendant Community Education Centers, Inc., styled: ***Frank Kwaning v. Defendant Community Education Centers, Inc (a/k/a George W. Hill Correctional Facility or Delaware County Prison)***, Civil Action No. 15-887. Plaintiff's Complaint is attached hereto as Exhibit "1."

2.      Defendant was served with Plaintiff's Complaint on February 2, 2015.

3.      As Defendant was served on February 2, 2015, Defendant has not yet filed an Answer or other response to the Complaint.  In filing this Notice of Removal, Defendant does not waive any defense or counterclaim that may be available to it.

4.      This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) because it is filed within thirty (30) days of February 2, 2015, when Defendant was served with the Complaint.

5.      Count IV of Plaintiff's Complaint alleges that Defendant breached the collective bargaining agreement ("CBA"). *See* Ex. 1, at ¶¶ 100-103. The CBA is a contract within the meaning of Section 301 of the Labor Management Relations Act, 29 U.S.C §185(a) ("LMRA"). *See Retail Clerks International Association v. Lion Dry Goods*, 369 U.S. 178, 28-29 (1962).

6.      Because this action seeks relief for a claim arising through a contract under Section 301 of the LMRA, this matter is a civil action over which this Court has original jurisdiction under the provisions of 28 U.S.C. §§ 1331,1337. *Avco Corp, v. Aero Lodge No. 735, International Association of Machinists and Aerospace Workers*, 390 U.S. 557, 550 (1968).

7.      Accordingly, this Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, and the action may be removed to this Court by Defendant pursuant to 28 U.S.C. § 1441.  The allegations set forth in the Complaint render this action a civil action arising under the Constitution, laws or treatises of the United States.

8.      This Honorable Court's jurisdiction is also based upon diversity of citizenship under 28 U.S.C. § 1332.

9.      Federal courts have original diversity jurisdiction over actions in which the matter in controversy exceeds seventy-five thousand dollars ($75,000.00) and the parties are citizens of different states.  28 U.S.C. § 1332.

10.     "A district court's determination as to the amount in controversy must be based on the 'plaintiff's complaint at the time [the] petition for removal was filed,'" *Werwinski v. Ford Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (quoting *Steel Valley Auth. v. Union Switch & Signal*, 809 F2d 1006, 1010 (3d Cir. 1987).

11.     Plaintiff demands judgment in excess of $75,000 in his complaint.

12.     "Section 1332 has been interpreted to require 'complete diversity.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 580 n. 2 (1999).  Thus, diversity jurisdiction "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant. *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

13.     Here, Plaintiff resides at 4940 State Road, Drexel Hill, Pennsylvania 19026.  *See* Ex. 1, at ¶1.

14.     Defendant CEC is a corporation organized and existing under the laws of the State of Delaware, with its registered address at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Affirmation of Paul Mazer, Esquire is attached hereto as Exhibit "2."

15.     Defendant CEC's principal place of business is in New Jersey, specifically 35 Fairfield Place, West Caldwell, New Jersey 07006. *See* Ex. 1, at ¶2; Ex. 2.

16.     Accordingly, there is complete diversity of all parties to the action.

17.     Written notice of this filing will be given to Plaintiff.  Also, as required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal will also be filed with the Prothonotary of

the Court of Common Pleas of Delaware County, Pennsylvania, the court in which the State

Court Action was filed.

WHEREFORE, Defendant, Community Education Centers, Inc., respectfully requests

that the above action, now pending in the Court of Common Pleas of Delaware County,

Pennsylvania, be removed therefrom and proceed in this Court as an action duly removed.

**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**

BY:     *s/ John P. Gonzales*
         JOHN P. GONZALES, ESQUIRE
         Marshall, Dennehey, Warner, Coleman & Goggin
         2000 Market Street
         Philadelphia, PA 19131
         (215) 575-2871 (p)
         (215) 575- 0856 (f)
         *Attorney for Defendant*

DATE: February 24, 2015

## CERTIFICATE OF SERVICE

I, JOHN P. GONZALES, ESQUIRE, do hereby certify that a true and correct copy of

Defendant's Notice of Removal was served upon opposing counsel by U.S. Mail at the following

address:

Stewart C. Crawford, Jr.
Law Offices of Stewart C. Crawford &Associates
55 N. Lansdowne Avenue
Lansdowne, PA 19050


**MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**

BY:     */s/John P. Gonzales*
JOHN P. GONZALES, ESQUIRE
Attorney for Defendant


DATE:  February 24, 2015

THE LAW OFFICES OF STEWART C. CRAWFORD & ASSOCIATES
By: Stewart C. Crawford, Jr., Esquire
Attorney Id. No.: 202188
55 North Lansdowne Ave.
Lansdowne, Pa 19050
Telephone: (877)-992-6311
Web: www.crawfordlaw.us
E-Mail: scrawfordjr@subrolaw.us
Firm File No.H13-0040

FILED

2015 JAN 30 PM 2: 53

OFFICE OF
JUDICIAL SUPPORT
DELAWARE CO. PA.

*Attorney for Plaintiff, Frank Kwaning*

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION-LAW

FRANK KWANING          :
4940 State Road         :
Drexel Hill PA, 19026     :
                      :         IN CIVIL ACTION NO.
   vs.               :
                      :     2015-000887
COMMUNITY EDUCATION   :
CENTERS, INC. (a/k/a GEORGE W.  :
HILL  CORRECTIONAL FACILITY or  :
DELAWARE COUNTY PRISON)  :
35 Fairfield Place        :
West Caldwell, NJ 07006   :     JURY TRIAL DEMANDED
                      :
      Defendant.       :

## COMPLAINT

Plaintiff, Frank Kwaning ("Plaintiff" or "Officer Kwaning") by and through his

undersigned attorney, hereby alleges and states as follows:

### Parties

1.     Officer Kwaning is an adult individual, residing at the above address.

Officer Kwaning is employed by the defendant as a corrections officer. Officer Kwaning

is a black male born in the Republic of Ghana, Africa. He is currently enrolled at Temple

University as a psychology major while working as a full time corrections officer for

1

Community Education Centers, Inc. at George W. Hill Correctional Facility (the "prison"). Plaintiff has been employed at the prison since 2009.

2.      Upon information and belief, defendant, Community Education Centers, Inc. a/k/a George W. Hill Correctional Facility or Delaware County Prison (the "Employer" or the "Prison"), is a New Jersey business entity authorized to transact business in the Commonwealth of Pennsylvania. Defendant maintains a principal place of business at 500 Cheney Road, Thornton (Delaware County), PA 19373. Defendant is also subject to service of process in the jurisdiction pursuant to 42 Pa.C.S. Sec. 5322.

**Factual Allegations**

3.      Plaintiff, Kwaning has worked at the George W. Hill Correctional facility as a corrections officer for more than five years (i.e. since 2009).

4.      Throughout that time, and through to the present day, Officer Kwaning has been involved with the corrections officer union where (as described below) he has been privy to the discriminatory employment practices of the prison. Officer Kwaning is presently on the Executive Board of the Union. In his capacity as a union representative, Officer Kwaning has heard in excess of 50 complaints of racial discrimination in the past year. He has urged each of the victims to make a formal grievance, however, more than 90% of those victims declined for fear of retaliation.

5.      Officer Kwaning is also privy to the fact that the prison is dangerously overcrowded and that the Employer has made fraudulent misrepresentations to certain regulatory agencies concerning the sufficiency of training and staffing at the prison. It is believed by Officer Kwaning that these misrepresentations were calculated to circumvent the maximum capacity of inmates at the prison for the purpose of earning more profits (i.e. the Employer is a private for profit prison). Thus, the Employer has

2

intentionally overcrowded the prison and made misrepresentations concerning the resources available to handle that capacity.

6.     A collective bargaining agreement controls (in part) the relationship between corrections officers and the employer. Importantly, that contract contains an anti-discrimination provision where the Employer warranted that it would not harass or discriminate against an employee on the basis of race. That collective bargaining agreement is not available for attachment to this complaint, however, defendant should already have it in its possession and or it is a matter of public record as it is attached to the Complaints of other African and African American corrections officers.

7.     A progressive disciplinary policy exists within that collective bargaining agreement. Essentially, if disciplinary action is warranted, section 13.01 of the contract requires the employer to impose sanctions short of discharge or suspension (i.e. the employee can't be simply fired).

8.     Article 13.04 of the collective bargaining agreement, however, lists several exceptions to this progressive disciplinary policy that will allow the employer to bypass the progressive discipline requirement and immediately terminate or suspend the employee.  Unfortunately, section 13.04 is drafted ambiguously and in such a manner that allows any violation of a prison rule to be subjectively deemed a serious infraction warranting immediate dismissal (e.g., even minor infractions in a prison can be branded as serious security risks).

9.     The subjective application of sections 13.01 and 13.04 is one of the mechanisms used to discriminate against African and African American corrections officers who are disciplined and terminated for minor disciplinary matters while white corrections officers, who commit equivalent or even more serious violations, are

3

permitted to be disciplined under the progressive disciplinary policy (when they are disciplined at all). This same ambiguity is also exploited discipline to African and African American corrections officers when no recognized infraction had occurred.

10.     The prison has about 400-500 corrections officers assigned to the George W. Hill correctional facility. In 2009, when CEC first assumed operations of the prison, approximately 80% of the corrections officers were African American. In 2013, less than 20% of the corrections officers are African or African American Americans.

11.     Officer Kwaning has been subjected to continued and unwarranted disciplinary scrutiny by the prison. These disciplinary acts are a means of discrimination and a precursor to termination or suspension. Indeed, the prison customarily attempts to create a paper trail of alleged disciplinary violations as a method of terminating African and African American employees for cause.

12.     These disciplinary acts are also a form of retaliation for filing charges of illegal discrimination.

13.     On recurring method of unwarranted discipline is the assignment to a rover position rather than a unit assignment. Even though management may have the authority to assign Officer Kwaning to the rover position, a rover assignment is supposed to be random. African and African American employees draw that assignment with greater frequency than do white employees. At the time he filed his discrimination charges, Officer Kwaning in particular averaged three rover assignments per week and has been assigned the rover post at least 30 times in the past two months. Presently, the rover assignments are disproportionate to race.

4

14.     Like other African and African American employees, Plaintiff has been removed from certain duties at a unit post. Plaintiff believes that the prison senior management is inherently distrustful of African and African American employees and therefore has attempted to remove African and African American employees from those units (as well as from the prison itself).

15.     Among other reasons, unit post stations are preferable because they do not involve continuous hours of standing as does a rover position. Moreover, rover positions are not always relieved in time for a meal break.

16.     When Plaintiff addressed the fact that on multiple occasions he was not relieved in a timely manner relieved for a meal break; he was threatened with insubordination (a terminable offense).

17.     Shortly thereafter, Plaintiff was written up for being late to roll call when he was in fact a minute early (i.e. the doors were closed early). This is another tactic employed by senior management to violate African and African American employees for minor things, unwarranted things. These unfounded violations interfere with promotions and ultimately lead to termination. Moreover, being late for roll call is not necessarily a recognized offense under article 16.3(b) the collective bargaining agreement.

18.     In addition to discriminatory terminations, the hiring of African and/or African American employees is likewise subject to illegal discrimination. For example, the three hiring classes of new employees last summer (i.e. 2012) were primarily white. Indeed, out of approximately 36 new recruits only 3-6 were African American. Previously, the hiring classes were primarily employees of color.

19.     White corrections officers who have been fired for cause from other institutions are hired by the prison to the exclusion of qualified African and/or African American candidates who had no such prior negative employment histories.

20.     For example, a number of police officers who were fired in 2011 from various local townships for cheating on their re-certification examinations were hired at the prison, displacing qualified African and/or African American candidates.

21.     Certain white corrections officers have, for some reason, been granted pass codes to restricted computer files, allowing them unfettered access to e-mail and other confidential file materials such as employee records, employee disciplinary matters, and employee medical leave information. This type of privileged access to confidential personnel files is reserved only for supervisory staff, not corrections officers. No African and/or African American corrections officers have been privileged with this type of access.

22.     African and/or African American corrections officers are given a disproportionate number of write ups for being late; white corrections officers, who are likewise late, are not written up in the same manner.

23.     Additionally, African and/or African American corrections officers are often disciplined twice for the same infractions, once for lateness and once for missing roll call. Their white counterparts are not disciplined twice for the same infraction and more often than not are not even disciplined once. And again, roll call write ups is not a recognized disciplinary offense.

24.     A write up for lateness interferes with the ability to be promoted. Therefore, African and/or African American supervisors are disproportionately

underrepresented in the prison and cannot achieve any meaningful progress with respect to addressing the prison's discriminatory practices.

25.     Similarly, African and/or African American corrections officers experience a disproportionate volume of work related speeding tickets as they attempt to rush to their posts to avoid this form of discipline.

26.     With respect to those writes up for being late, white supervisors would sometimes use their own personal watches as a basis for judgment rather than the official prison time. Accordingly, African and/or African American officers were accused of being late in circumstances that were unwarranted. The intent of these white officers was to discipline African and/or African American corrections officers, regardless of whether or not those write ups was justified.

27.     African and/or African American female corrections officers are disproportionately subjected to a pat down when entering the facility. This is due to an erroneous perception by the white commanding officers that African American female corrections officers are carrying drugs and other illegal contraband for the African American prisoners with whom they have developed an inappropriate relationship. White female corrections officers do not suffer from that same perception and are accordingly not patted down in the same manner or with the same degree of thoroughness.

28.     Essentially, the prison treats African and/or African American corrections officers with suspicion, suggesting that they illegally transport contraband for the prisoners. The prison does not cast the same degree of suspicion toward white corrections officers.

29.     This same unwarranted cloud of suspicion invades other aspects of the prison. For example, by the end of the summer 2012, all African American corrections officers were transferred out of Unit 2 and reassigned to other posts. Less qualified white corrections officers (some with as little as 6 months on the job) were assigned to replace those more experienced African and/or African American officers.

30.     The perception amongst African and/or African American corrections officers is that African and/or African American supervisors are at higher risk of termination. This creates a disincentive to apply for management positions (i.e. there is greater job security to remain in the ranks with union protection rather than apply for a management position). Again, this contributes to the disproportionate dearth of African and/or African American supervisors and limits opportunities for African and/or African American corrections officer to earn higher wages.

31.     Certain white corrections officer recruits have clearly marked tattoos that reflect racially derogatory imagery and participation in white supremacist groups. The prison senior management turns a blind eye and does not require this form of racial depiction to be covered up while on duty.

32.     Importantly, intake officers are trained to identify the meanings of certain tattoos when processing inmates; such images are coded and stored in the computers. Thus, the prison is more than aware of the meaning of some of the racist imagery.

33.     White corrections officers freely use racial slurs and derogatory inferences when referring to African and/or African American prisoners. These racially motivated comments are made in front of African and/or African American corrections officers and include the use of the terms: nigger, monkey, coon, black motherfucker among other names.

34.     A white officer referred to a prisoner as a "nigger" in front of an African American training officer. Incredibly, the African American training officer (not the white corrections officer) was written up for the ensuing confrontation. Essentially, the African American training officer was disciplined for not ignoring these derogatory remarks.

35.     African and African American corrections officer who were assigned to the K-9 unit and the CERT team (i.e. the prison equivalent of a SWAT team) were harassed on a perpetual basis. At least one went out on disability for emotional distress another left K-9 altogether and subsequently departed the prison. A noose was left on the work locker of one of these officers and he was subjected to disparate treatment on a daily basis which included mockery of his African accent. This African officer was further subjected to menial tasks in this unit, task clearly below those of his experience level.

36.     More seriously, this African American K-9 officer had his ankle broken intentionally during a CERT team training exercise; white officers who were harassing this officer intentionally jumped onto his ankle to cause him harm. To those with specialized training, it was clearly an intentional maneuver.

37.    A second African American corrections officer quit K-9 after enduring the same discriminatory harassment. Still another African American K-9 officer was physically assaulted (numerous times) by white members of the K-9 unit.

38.    As noted above, there is a disparity in the application of the progressive discipline policy. African American corrections officers are terminated for minor infractions that would have required a warning rather than suspension or termination. White corrections officers commit much more serious infractions and are given the benefit of the progressive discipline policy. For example, white corrections officers have inadvertently released prisoners on multiple occasions and have beaten prisoners. Although acting grossly negligent, these corrections officers are still employed and were never subjected to the just cause termination provision notwithstanding the severity of their negligence. African and African American corrections officers, however, are terminated for far less egregious offenses (e.g., delivering a message to a prisoner's family member, leaving a post for four minutes, leaving an internal door unlocked, exaggerating, reporting late to roll call, etc.). These minor infractions are labeled as gross negligence.

39.    In May of 2012, an African American corrections officer was instructed to cut her "afro" hair style. The reason provided for that instruction had nothing to do with safety or job performance, instead she was informed that her hair style was "too loud" and had afrocentric "symbolism." Previously, this same officer had dreadlocks and was instructed to cut them off because they too were too "symbolic" and were not "Eurpoean" enough.

10

40.     Similarly, in 2009, other African American employees were required to cut their dreadlocks. Two Rastafarian corrections officers were terminated for non-compliance. By contrast, at least one white woman who also had dreadlocks was neither disciplined nor terminated. No reasonable explanation was ever provided by the prison for why the dreadlocks were objectionable; the perception by African American employees is that Afro-centric appearances were being targeted. This perception was bolstered by the prisons contemporaneous prohibition of Muslim headwear.

41.     In the summer of 2012 (around June or July), an African American corrections officer was soliciting tickets for some form of non-work event (e.g., bake sale, pretzel sale, etc). She was escorted off the grounds by the k-9 unit and disciplined. Around the same time, a white corrections officer was also soliciting tickets for some form of non-work event (e.g., mixed martial arts tournament). He was not disciplined; the white supervisors looked the other way. Moreover, white prison commanders actually purchased these tickets and attended his event.

42.     Two similar but unrelated incidents (one involving a white corrections officer the other a African American corrections officer) reflects the disparate treatment with respect to the progressive discipline policy. Around January 2012, both officers were arrested for criminal offenses at their residences. The charges against African American corrections officer were ultimately dropped, nevertheless he was not allowed back into the facility. The white corrections officer was not disciplined (and his offense involved a gun discharge). Moreover, the white corrections officer was actually bailed out of jail by a member of senior management.

43.     In December 2012, white corrections officers were permitted to call out without being charged sick time. African American or African corrections officers were never allowed this privilege or were disciplined for not having available sick time.

44.     The day to day operations are run by 5-6 white commanders/assistant wardens. All told, there has been about 5-6 wardens over the last eleven years. As wardens come and go, these 5-6 white senior managers enforce prison policy and essentially run the prison. Essentially, these 5-6 white commanders who run the prison are the source of the discrimination problems, both directly and indirectly (for allowing the bigotry to fester and become part of the prison infrastructure). Consequently, no racial discrimination problems can be meaningfully resolved since all complaints begin and end at the desk of these white senior managers. No racial discrimination problems can be meaningfully resolved since all complaints begin and end at the desk of these white senior managers.

45.     The corporate offices have no oversight and have seemingly abandoned the prison; leaving it to be mismanaged from within. Even the human resources department is dysfunctional; it had no hiring and firing responsibilities. Instead all personnel decisions come from the 4-5 senior managers.

46.     In January 2012, a union representative drive to CEC corporate offices in New Jersey, outside of New York City, and informed them personally of the mismanagement at the prison and of the racial discrimination. No corrective action was ever taken.

47.     In the Fall of 2012, union representatives provided a Vice President of the corporation with a list of instances of mismanagement at the prison and of the racial discrimination. No corrective action was ever taken. In fact, the corporate vice president

12

was invited by the union represents to come see the conditions for himself; he declined citing the fact that the assistant warden informed he wasn't required to go on that kind of tour.

48.     As noted above, qualified African American job applicants are not sleeted for employment but lesser qualified white employment candidates are selected.  When qualified applicants are interviewed (if selected to be interviewed in the first place) they are routinely informed that further background checks are required and sent home never to be recalled. White applicants are signed up immediately with no additional background checks.

49.     At the time the charges were filed, the training and testing provided were lax and ineffective, allowing unqualified officers to pass into the prison ranks without being identified. The absence of adequate training is one of the primary problems contributing to the discriminatory culture. One of the reasons that training was inadequate is because it doesn't even occur.  Although Federal and State guidelines mandate forty hours of mandatory training per year, only a fraction of that time is actually spent in training. For example, officers will show up for a four hour training course but then released after an hour.

50.     The testing is also meaningless, there is nearly a 99% pass rate; unqualified people are most certainly not flushed out and not instructed about how to properly carry out prison policy.

51.     All told, perhaps as little as 8 hours of mandatory training actually occurs. The instructors falsify the training reports to make it appear as if the full four hours was performed. Moreover, no meaningful diversity training is ever provided; instead, the only thing that occurs is a reading of the prison's diversity statement. No workshops or

guidelines on diversity are ever provided. Thus, there is a direct correlation between the lack of training and the mistreatment of African American officers and prisoners.

52.    As noted above, the misdeeds of white corrections officers are rarely addressed. If they are, the white corrections officers are given the benefit of the progressive disciplinary policy whereas the African American officers are disciplined under Article 13.04. For example, on May 12, 2012 a white corrections officer threw a punch at an African American corrections officer. Despite a report of this incident to senior management no investigation ever occurred and no discipline ever took place. Note, this attempted assault occurred in an area where cameras from in-house DVR system had captured footage; in other words, it was a verifiable incident that was never investigated.

53.    Several months after this incident, on August 31, 2012, that same white officer was scheduled in the same unit and on the same shift as the African American corrections officer. The white officer informed his supervisors that he intended to "get into it" with the African American officer. The prison's solution to this issue was to move the African American officer (a more experienced officer) to a less desirable station. Incredibly, the African American officer was disciplined for insubordination when he protested being placed in a less desirable duty. The African American officer grieved this situation to the warden. The prison never addressed it.

54.    The disparate application of the progress disciplinary policy isn't even a secret. White members of Senior Management routinely threaten to write people up for cause (i.e. under Article 13.04) to address minor issues. Importantly, if someone truly violated Article 13.04 discipline, a warning or threat would not be appropriate. Warnings are reserved for 13.01 acts. Essentially, senior management is knowingly

14

taking warning situations but suggesting that they have the authority to indiscriminately choose to bring charges under 13.04. As noted above, it is precisely the vagaries of this contractual language that have allowed senior management to fulfill their illegal agenda of eliminating African Americans from employment. Management refers to it as a "write up game."

55. Recently, it was determined by a counselor for Unit 2 that the prison would be more harmonious if the cells were segregated according to race. No empirical data was used to justify that racial conclusion, it was just the belief of the counselor and Senior management. Importantly, the cell segregation had the effect of denying African American prisoners certain jobs that were preferential and higher paying. The counselor claimed to have been ordered to segregate the cells by a member of senior management.

56. When an African American corrections officer complained of this racial segregation policy, he was removed from that post.

57. When concerns with discriminatory or disparate treatment are voiced, they were met with ridicule and obstinacy. Prison management never resolves these issues. Moreover, African and African American employees are reprimanded for expressing their diversity concerns.

58. African and African American employees are reprimanded for minor infractions, often in unwarranted circumstances. When a white sergeant is disciplined, it is for particularly egregious offenses (e.g. rape, assault, etc.). Even then, the suspension is short lived. For example, one sergeant was suspended for only two days for the use of excessive force which resulted in to the hospitalization of an African American prisoner. African American employees are never treated with this form of forgiveness for disciplinary acts; in fact, African and African American employees are held to a much

15

higher standard of scrutiny and must conduct themselves nearly perfectly lest they be terminated immediately for minor infractions.

59.     White employees who have DUI's are not disciplined. African American officers who similarly have DUI's are terminated.

60.     In 2011, a white officer referred to an inmate in intake as a "nigger." This slur was made in front of African American corrections officers.

61.     On April 9, 2013 a random car check occurred. 6 weapons were found in the respective vehicles of two white officers. No disciplinary action was taken. A few years ago in a similar search, a single BB gun was found in the trunk of a vehicle. The two African American officers riding together in that vehicle were both terminated including the passenger who had no access to the trunk or knowledge that a BB gun existed.

62.     On February 3, 2010, an assistant warden was overheard by African American corrections officers as saying "the only black people working here are the ones that I allow"

63.     African American officers are not only discouraged from taking the exam for a supervisor position, but even when they do they are blackballed or disqualified for other reasons. At least two African American sergeants had two take the examination nearly thirty times each. The vast majority of those times they passed the test.

64.     White corrections officers, on the other hand, are often given the examination content or questions in advance to facilitate their passing. Essentially, they are provided with an unfair advantage.

65.     In May 2012, an African American officer was terminated for leaving a control room in the medical unit for four minutes to check on unsupervised inmates and to check on a schedule (with the permission of her sergeant). In October 2012, a white corrections officer left the entire wing against the protests of his African American Sergeant. The ensuing write up was not only discarded by senior management but the white officer was praised by white senior management.

66.     On September 26, 2012 a white corrections officer used the word "nigger" in front of an African American officer. That African American officer reported the incident to senior management who took no disciplinary action. In fact, senior management stated "he is just expressing himself." Ultimately the warden intervened and disciplined the white officer; had the warden not discovered this incident senior management would have permitted it to exist.

67.     In 2011-2012  A long tenured white employee passed away. The flags were lowered in his honor. Around the same time a long tenured African American employee similarly passed away; when the flags were lowered in his honor they were ordered to be raised again. The understanding is that this disparate treatment was racially motivated.

68.     One of the assistant wardens, a member of the 5-6 white senior management will intentionally fail to acknowledge African American officers whom he passes in the hallway. His treatment of white employees is markedly different; he will engage in small talk and general cordiality. With Africans and/or African Americans, however, he will demonstratively refrain from making eye contact or communications. Sometimes he will pretend to be making phone calls (even though the phone has been observed to be upside down). He does not treat white employees with the same degree of disdain.

17

69.     White sergeants and white corrections officers make fun of Plaintiff's African accent. To understand the extent of the mistreatment, a friend of Plaintiff (also from Africa) was forced to resign because of this form of abuse.

70.     One of the adverse effects of frequently drawing the above mentioned rover assignment is the toll that the chronic standing takes on the body, Complainant's feet are more sore than those on a unit assignment. Again, this assignment is inappropriately made along racial lines.

71.     In February 2013, Plaintiff was injured and requested light duty. He was informed by the prison that light duties were not available. Shortly thereafter, a white officer was injured and similarly requested light duty. That white officer was granted light duties. Plaintiff believes this to be yet another example of the privileges that are denied to African and/or African American employees.

72.     In May 2013, Plaintiff discovered that prison management had manipulated his personnel file to cast dispersions on his character in relation to an NLRB investigation. Essentially, prisoner grievances were placed directly into the personnel file without proceeding through the filtering process with the grievance coordinator; this act violated company rules. In other words, unsubstantiated complaints were placed directly into the personnel file to make it appear as if Complainant had multiple complaints directed toward him.

73.     Two standards of treatment existed at the prison, one for white prisoners and one for prisoners of color.

74.     African and/or African American prisoners are regularly subjected to threats of physical harm, intimidation and other forms of assault by white corrections officers and supervisors. These circumstances can be deemed nothing short of hate crimes since the objects of the abuse are clearly African and/or African American prisoners, not white prisoners.

75.     On one occasion, a white corrections officer spit in the face of an African American prisoner, while that prisoner was handcuffed.

76.     In November 2012, two white sergeants beat an African American prisoner so severely that the prisoner required emergency treatment and hospitalization off premises (rather than in the prison hospital). The beating was unprovoked and occurred in the prisoner's cell (where he posed no threat to anyone). It was so bad that the prisoner was begging for the white supervisors to stop beating him and begging for his mother. The two supervisors had no good reason to be in the African American prisoner's cell at that time; they went there for the purpose of tormenting that prisoner. A third white corrections officer whose job it was to videotape the encounter, intentionally turned the camera away from the assaults. Those two white supervisors had previously beaten other prisoners in this manner, even prisoners who were handcuffed at the time.

77.     Those two white sergeants were never subjected to the immediate termination provision of Article 13.04, instead they were disciplined under the progressive discipline policy of Article 13.01. In fact, shortly after their two day suspension they were each rewarded with a first shift, a desirable shift in the prison, one they had each requested prior to this incident.

78.     White corrections officers have illegally planted drugs and other contraband on African American prisoners.

79.     For example, on one occasion a shank was planted on an inmate by a white officer. This inmate had just passed through intake where he was strip searched and cleared (i.e. he had no shank entering the prison). At intake the prisoner got into an argument with a white officer. Approximately 40 minutes later, after the prisoner had been issued his clothes and escorted to his cell, that white officer continued the confrontation by appearing at the prisoner's cell.  Shortly thereafter, a special cell search team (i.e. the "goon squad") was called by that white officer who discovered a shank in the prisoner's cell and pressed charges against the prisoner.  That shank was planted by the white officer.

80      African American inmates (not white inmates) are also subjected to frigid cells (i.e. blow freezing) with no blankets

81.     White corrections officers deny phone calls to African American inmates.

82.     In 2010, another African American prisoner was targeted for being African American. The prisoner was not being rowdy nor threatening. His head was bumped into door jams by white officers until he suffered a brain injury requiring hospitalization. Excessive use of force, such as these two examples, occurred on a regular basis and was disproportionately more severe with African American prisoners. Aside from the racially motivated beatings, the discipline imposed on the white supervisors was not the same discipline that would have been imposed on African American officers had the circumstances been reversed, as noted before, African American officers are terminated for far less serious offenses (e.g., leaving a post for 4 minutes, passing message to a prisoners family, dozing on the job, etc.).

83.    White corrections officers will alter reports to justify excessive use of force on African American prisoners. For example, white corrections officers will allege that African American prisoners spit on an officer or performed some other undetectable or unverifiable act warranting physical restraint when no such initial physical action by the prisoner occurred. Instead, the catalyst is normally something less serious such as attitude from the prisoner or a funny look.  In other words, a white corrections officer might perceive some demeanor or attitude of the prisoner that is not appreciated so the white corrections officer overreacts and responds with the use of force (more often excessive force) and then lies on the report about the incident.

84.    White corrections officers overuse pepper spray, essentially painting prisoners. The protocol calls for minimal use of thee spray.  In fact, the overuse of the spray can be verified by comparing the number off incidents where spray was documented to the supply and ordering of the spray by the prison. The prison now orders gallon containers rather than smaller containers. This is the product of lack of training and oversight.

85.    African American prisoners are disproportionately denied access to counselor services which has an adverse impact on their participation in special programs.

86.    White inmates are given preferential treatment. For example, weekend inmates who are white are often permitted to stay in medical and bring books and televisions and make phone calls.  No African American inmate was ever given such perks.

87.     When Plaintiff was assigned to Unit 2, an inmate cell search was conducted randomly by Plaintiff and other unit officers and found no contraband. Less than two hours later, white sergeants claimed to have discovered $20 in that inmates cell and placed the inmate on disciplinary detention. Plaintiff believes that the $20 was planted, in part because of the fact that the cell was searched less than two hours before. The inmate was African American.

88.     Other instances of discrimination, retaliation and harassment occurred continuously throughout each year of Complainant's employment. The Employer should have documents in its possession further reflecting this continued mistreatment (e.g. hiring and firing records, disciplinary records, grievance records, investigative records, etc.). Other corrections officers (as well as the Union) may likewise have corroborating evidence reflecting what Complainant and others have had to endure, provided they are not too fearful to come forward.

89.     On July 22, 2013, Officer Kwaning filed charges against defendant with the Pennsylvania Human Relations Commission alleging acts of illegal discrimination, retaliation, and harassment (i.e. hostile work environment).

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

### COUNT I- DISCRIMINATION
(Plaintiff vs. Defendant Employer)

90.     Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

91.     The Defendant has discriminated against, the Plaintiff because of his race, ethnicity, and national origin in violation of 43 P.S. 951 et.seq., the Pennsylvania Human Relations Act prohibiting discrimination in employment.

92.     As a direct and proximate result of this conduct, Officer Kwaning suffered damages. The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

### COUNT II- RETALIATION
### (Plaintiff vs. Defendant Employer)

93.     Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

94.     The Defendant has retaliated against, the Plaintiff because of his race, ethnicity, and national origin in violation of 43 P.S. 951 *et seq.*, the Pennsylvania Human Relations Act prohibiting discrimination in employment.

95.     The Defendant has retaliated against, the Plaintiff for filing charges of discrim9ination, retaliation, and hostile work environment.

96.     As a direct and proximate result of this conduct, Officer Kwaning suffered damages. The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

## COUNT III- HOSTILE WORK ENVIRONMENT
(Plaintiff vs. Defendant Employer)

97.   Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

98.   The Defendant has created a hostile work environment because of Plaintiff's race, ethnicity, and national origin in violation of 43 P.S. 951 et.seq., the Pennsylvania Human Relations Act prohibiting discrimination in employment.

99.   As a direct and proximate result of this conduct, Officer Kwaning suffered damages. The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

## COUNT IV- UNJUST ENRICHMENT
(Plaintiff vs. Defendant Employer)

100.   Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

101.   The Employer received a financial benefit from Officer Kwaning reluctance to seek a higher paying supervisor position.

102.   The Employer accordingly was unjustly enriched at the expense of Officer Kwaning.

103.   Officer Kwaning seeks equitable disgorgement of that enrichment.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of

this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

## COUNT VII- NEGLIGENCE PER SE
### (Plaintiff vs. Defendant Employer)

104.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

105.    The Employer actions violated certain statutes and regulations that were designed to prevent the harm that ensued.

106.    The Employer breached various duties and violated those laws resulting in harm to Officer Kwaning.

107.    The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

Stew Crawford, Jr., Esq.

*Counsel for Complainant*

25

<u>VERIFICATION</u>

I declare under the penalty of perjury the attached is true and correct to the best of my knowledge. I hereby verify, swear and affirm that the statements contained herein are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. Section 4904, relating to unsworn falsification to authorities.


By: _____
    Frank Kwaning


Dated:


1



LAW OFFICE
STEWART, S.
55 N. Lansdowne

FIRST CLASS

Community Education Partners, Inc.
35 Fairfield Place
West Caldwell, NJ 07006

7014 0510 0000 8784 9671

UNITED STATES
POSTAL SERVICE

U.S. POSTAGE
PAID
MEDIA, PA
19063
JAN 14 '15
AMOUNT
$8.0
00008584

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

(i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii)     actions for support, Rules 1910.1 et seq.

(iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.