IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK KWANING | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 15-928 |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. | : | |
| | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                          **November 10, 2015**

Dissatisfaction with a prison workplace, including unfair workplace policies, exceptionally rude manners and perceived assignment preferences may be appropriate for a union grievance and internal redress.  Proof and jury review of discrimination and hostile work environment requires more.   To proceed to a jury under a race and national origin discrimination claim, a corrections officer claiming his present long-term employer discriminated against him based on his race and national origin must show an adverse employment action beyond a perceived extended rotation in a job randomly assigned to all corrections officers requiring him to stand rather than sit.  To proceed on a hostile work environment claim, he must show severe or pervasive misconduct known to him beyond isolated juvenile comments or workplace policies never before challenged as discriminatory.   After discovery, the corrections officer is unable to show disputed issues of material fact and we grant Defendant's motion for summary judgment dismissing his claims as a matter of law in the accompanying order.

## I.     UNDISPUTED FACTS[1]

Since 2009, Defendant Community Education Centers, Inc. ("CEC") has operated the George W. Hill Correctional Facility (the "Prison") in Delaware County, Pennsylvania.  CEC employs Plaintiff correctional officer Frank Kwaning ("Officer Kwaning") since taking over

Prison management.[2]

Officer Kwaning is a native of Accra, Ghana, emigrating to the United States in 2006 after serving in the Ghanaian police service.[3] Upon arrival in the United States, Officer Kwaning secured various jobs including working at a Home Depot store and a nursing home.[4] In 2009, Officer Kwaning became a corrections officer at the Prison.

The Prison consists of units, which house the inmates. Each unit is numbered and corresponds to a particular area of the Prison—*i.e.* Unit 9 is the female inmate housing unit.[5] Officers assigned to rover duty in Units 4-7 are required to stand for two hours at a time until they are rotated out and may not sit in a chair during those two hours.[6] The officers in these units are responsible for escorting inmates, staff, and other visitors through the main hallways leading to each unit. The officers must pat down inmates either leaving the unit or returning to the unit. In other units—Units 2, 8-10—rover officers are allowed to sit in a chair during the duration of their rover assignment when not performing their duties, which include largely the same responsibilities as other units.[7] The Prison does not allow chairs in Units 4-7 due to the possibility of inmates using them as weapons during an attack on staff or other inmates.

The relationship between the corrections officers and the Prison is governed by a collective bargaining agreement ("CBA").[8] The CBA provides the Prison the ability to manage and operate the correctional facility, including "the direction of the work force."[9] Accordingly, the Prison may assign corrections officers to any post it deems necessary.[10]

Officer Kwaning is an active participant in the grievance process at the Prison. As both a correctional officer and a union representative, Officer Kwaning regularly grieves what he believes to be unfair treatment directed towards correctional officers. Officer Kwaning has, over the last four years, submitted grievances complaining of a wide variety of conduct.

On May 2, 2011, Officer Kwaning submitted a letter to the corrections officer union president and copied the Prison chief of security, complaining of a threat to his employment.[11] According to Officer Kwaning, Sergeant Cooper threatened to send him back to "start training because [he] do[es] not understand English language."[12] Officer Kwaning stated in the letter, he found this experience to be derogatory, insulting, and a challenge to his competence.[13]

In August and September 2011, Officer Kwaning submitted grievance forms detailing his interaction with certain inmates. Officer Kwaning recounts one incident where an inmate yelled at him and called him a "nigger" and another instance where a different inmate threatened his life. [14] Officer Kwaning complains the Prison did not take any action against the inmates in his grievances.[15]

Officer Kwaning complained about the rover position on June 6, 2012. Officer Kwaning complains about rovers in Units 4-7 not being able to sit in a chair while on duty.[16] Officer Kwaning points out officers in other units are allowed to sit in a chair and the Prison's distinguishing between posts is not in accord with "past practice." He also complains the Prison's concern for chairs being used as weapons is unfounded due to the presence of chairs in other parts of the Prison. Last, he accuses the Prison of not following proper CBA procedures in approving this new policy. On this same subject, Officer Kwaning filed a follow-up grievance on June 25, 2012, where he complained the rover duty is discriminating against officers "on the basis of the post they work."[17]

In another grievance submitted on August 24, 2012, Officer Kwaning alleged the roll-call doors were shut prior to the 7:50 a.m. starting time and as result he was marked late.[18] When Officer Kwaning realized the doors were shut early, he knocked on the door three times disrupting roll-call. Lieutenant Juisti called him to his office to issue him a write-up for

reporting late to roll-call.[19]  When Officer Kwaning questioned why he was being written up, Lieutenant Juisti allegedly told him to "shut up" or he will send him home.[20]  Ultimately, Officer Kwaning did not receive discipline and according to Officer Kwaning, Lieutenant Juisti apologized to him.[21]

In yet another grievance submitted on September 26, 2012, Officer Kwaning alleged Deputy Warden Colluci threatened his employment.[22]  Officer Kwaning detailed feeling threatened and intimated.[23]

In late May and early June 2013, Officer Kwaning submitted a string of grievances relating to the removal of a memorandum prepared by Chief Gannon from his personnel file.[24] Officer Kwaning requested the memorandum be removed from his personnel file but the Prison denied that request.  Chief Gannon's memorandum prevented Officer Kwaning from working on Unit 2 after he was removed due to inmate complaints.  While the Prison did not remove the memorandum due to pending litigation, Acting Chief Human Resources Manager Captain John McCarthy offered to inform all supervisors that Officer Kwaning "may be assigned to any post in the facility as they deem necessary."[25]

Finally, on November 20, 2013, Officer Kwaning submitted a request for information— using a prison grievance form—regarding various policies including uniforms, post assignments, and meal schedules.[26]  On December 3, 2013, Officer Kwaning received a verbal warning for taking his "chow" break at the wrong time.[27]

CEC continues to employ Officer Kwaning as a corrections officer without loss of pay or status.

## II.    ANALYSIS

CEC moves for summary judgment on Officer Kwaning's two claims under the Pennsylvania Human Relations Act ("PHRA"): 1) race and national origin discrimination; and 2) hostile work environment.[28]  CEC argues Officer Kwaning fails to establish a *prima facie* case sufficient to support either claim at the summary judgment stage.[29]

### A.    Officer Kwaning cannot show race and national origin discrimination.

Title VII and the PHRA "prohibit[] discrimination in employment on the basis of an employee's race," as well as national origin.[30]  Where a plaintiff relies on indirect or circumstantial evidence, we analyze race discrimination claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*.[31]  We first determine whether Officer Kwaning states a *prima facie* case of discrimination; if he has, we ask whether CEC advanced a legitimate non-discriminatory reason for its conduct; and, if CEC has done so, the burden shifts back to Officer Kwaning to prove that CEC's proffered reason is pretextual.[32]

To establish a *prima face* race or national origin discrimination claim, Officer Kwaning must show (1) he is a member of a protected class; (2) who suffered an adverse employment action; and (3) the circumstances of the adverse employment action give rise to an inference of discrimination.[33]

### *Officer Kwaning fails to show he suffered an adverse employment action.*

CEC still employs Officer Kwaning as a correctional officer.  He describes himself as "one of the finest officers" in the Prison.[34]  Officer Kwaning complains he suffered an adverse employment action when the Prison assigned him to the "Rover" position more often than other officers.  The Prison consists of units.  Each unit is numbered and corresponds to a particular area of the Prison—*i.e.* Unit 9 is the female inmate housing unit.[35]  Officers assigned to rover

duty in Units 4-7 are required to stand for two hours at a time while patrolling hallways.[36]  In addition, officers assigned to those rover units are not allowed to sit in a chair during their assignment.[37]  In other units—Units 2, 8-10—officers are allowed to sit in a chair during their rover assignment when not performing their duties.[38]

Officer Kwaning complains CEC assigned him to the rover units where he could not sit in a chair with a greater frequency than any other officer.  He calculates, based on a recollection recorded in his daily planner, CEC assigned him to these rover duties approximately eighty (80) times over the course of a year.[39]  On June 6, 2012, Officer Kwaning submitted a grievance concerning the standing rover positions.[40]  The grievance challenged the appropriateness of not having chairs in the hallways occupied by rovers.  First, he challenged the given reason for why chairs are not allowed in the hallway: inmates may use them as a weapon.  Second, he states housing officers are allowed to sit in chairs while on duty and drawing a distinction between officers on housing units and those in the Prison's main hallway only serves to "enforce hostilities and discrimination."[41]  Last, Officer Kwaning's grievance challenges the procedural propriety of the rule implementation declaring any changes must be reduced to writing and executed by both CEC and the union.[42]

CEC argues Officer Kwaning has not adduced facts of an adverse employment action.  CEC rightly focuses on Officer Kwaning's assignment to the "Rover" position with what he contends is a much greater frequency than any other correctional officer employed by the Prison.  CEC, as policy, does not grant "permanent posts" to correctional officers. Rather, CEC assigns a random post each day they work.  CEC contends Officer Kwaning's claim "boils down to a matter of preference" because he prefers to be assigned to rover positions where he can sit down in a chair rather than those where he cannot.

In the discrimination context, an adverse employment action is one serious enough to alter an employee's compensation, terms, conditions, or privileges of employment.[43] We recognize something less than termination of a plaintiff's employment may be considered adverse for our purposes, but "[m]inor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions."[44]

We cannot find Officer Kwaning's assignment to rover duty is an adverse employment action sufficient to establish a *prima facie* case of discrimination.  Something less than termination can serve as an adverse employment action.[45] Even transfers resulting in neither lost pay nor rank may sometimes constitute an adverse employment action.[46] In *Zielinski*, our Court of Appeals affirmed the district court's finding a transfer from the specialized drug investigation unit to a patrol unit constituted an adverse employment action.[47] The state trooper plaintiff did not lose rank or pay as a result of the transfer but our Court of Appeals, without discussion, found this transfer to be sufficient to constitute an adverse employment action.[48]  While the Court of Appeals does not describe it as such, we can draw a reasonable inference from the *Zeilinski* facts that the transfer in fact constituted a demotion.[49]

Officer Kwaning does not claim he suffered any loss in rank or pay as a result of being assigned to the rover posts which require standing.  He does not claim any of his myriad grievances caused a loss in rank or pay.  Unlike the state trooper in *Zielinski*, Officer Kwaning cannot show CEC's alleged conduct, including rover duty, can reasonably be construed as a demotion.  According to Officer Kwaning, all the rover posts include the same responsibilities and the only difference between the rover positions in a unit other than units 4-7, is the ability of officers to sit in a chair.  The assignment cannot be viewed as a demotion when every officer is assigned to the post and the job responsibilities are identical.[50]  The frequency with which

Officer Kwaning is assigned to these posts does not militate a different result. Officer Kwaning's proof is his diary keeping track of only his assignments. He has no way to know the frequency of officers' assignments to the standing rover posts on shifts other than his own, as he states his method of calculation is listening to the officers' names and assignments being called at roll-call when the shift begins. Officer Kwaning is not permanently assigned to these rover posts, nor is he even temporarily assigned to these rover posts. Even construing all the facts in favor of Officer Kwaning, we find no reasonable juror could conclude CEC's assignment to the rover position qualifies as an adverse employment action.[51]

While we perceive Officer Kwaning to be alleging rover assignment is the adverse action and he confirmed this position during oral argument, it is not entirely clear from his opposition brief. Officer Kwaning submitted myriad grievances to the Prison management on a wide variety of issues and it is entirely possible he believes any of the incidents discussed in his opposition brief may constitute an adverse action. For instance, Officer Kwaning testified to an incident which occurred in 2011 or 2012 where he was forced to empty his pockets in the security line while no other officers were required to.[52] This action does not constitute an adverse employment action which affected Officer Kwaning's terms and conditions of employment. Another instance arose in May 2011 when a sergeant threatened his job for "not understanding the English language.[53] Again, this rudeness and unpleasantness cannot be considered an adverse employment action.[54]

Officer Kwaning is vigilant in asserting rights. We commend Officer Kwaning for voicing concerns when he is aggrieved. But his frequent grievances on working conditions for him and others do not automatically constitute adverse employment actions under the PHRA. After discovery and now put to burden of answering a summary judgment motion, Officer

8

Kwaning cannot adduce facts of a *prima facie* case of race or national origin discrimination where he has not suffered an adverse employment action.

**B.      Officer Kwaning does not show severe or pervasive discrimination necessary to sustain a hostile work environment claim.**

To demonstrate a PHRA hostile work environment claim, Officer Kwaning must adduce material facts evidencing genuine issues of whether: 1) he suffered intentional discrimination because of his race or national origin, 2) of a severe or pervasive nature, 3) which detrimentally affected him, 4) and would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.[55]   Officer Kwaning cannot rely solely on comments or actions directed at other employees to establish the first prong of a hostile work environment claim.[56]   If he can point to comments or actions directed at others personally, a court may consider those directed at other employees so long as he can establish a nexus between the two.[57]      In deciding whether the alleged conduct constitutes a hostile work environment, we must be careful to view the totality of the circumstances rather than viewing incidents individually.  Factors for us to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[58]   "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim.  Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment."[59]  "Even conduct that is unquestionably offensive or rude will not rise to the level required to make out a hostile work environment claim unless it sufficiently severe."[60]

While we found above Officer Kwaning failed to adduce facts sufficient to maintain a claim for race or national origin discrimination, we do not find our determination in the

discrimination context dispositive on the first prong of our hostile work environment analysis. The first prong of a hostile work environment claim requires intentional discrimination based on the plaintiff's protected classification. Yet, we do not require each incident taken into account in evaluating a hostile work environment claim to amount to an adverse employment action. Therefore, we do not view Officer Kwaning's failure to maintain his discrimination claim as necessarily requiring a finding against him on his hostile work environment claim for failure to establish the first prong.

Nonetheless, we find Officer Kwaning failed to adduce sufficient evidence on his hostile work environment claim. CEC argues Officer Kwaning's allegations do not rise to the "severe or pervasive" level necessary to establish a hostile work environment.[61] Deploying the venerable advocacy tact of putting the rabbit in the hat, CEC focuses on just two events derived from Officer Kwaning's claims based on CEC: 1) requiring Officer Kwaning to empty his pockets going through security; and 2) disciplining him for arriving late for roll-call despite his claim he arrived on time.[62] These two incidents do not establish intentional discrimination so severe or pervasive sufficient to create a hostile work environment. Recognizing CEC's two citations are not enough, Officer Kwaning during oral argument cited the totality of events occurring at the Prison, including CEC creating a hostile work environment by violating his rights under the Family and Medical Leave Act ("FMLA") as separately alleged in another case before us at No. 15-6021. This FMLA claim is not ripe here. Additionally, at oral argument, Officer Kwaning articulated his position as a union representative has allowed him to hear of all the discrimination occurring in the Prison which has created a hostile work environment. This is insufficient to sustain a hostile work environment.[63]

Furthermore, Officer Kwaning's grievances properly before this Court do not establish

10

severe or pervasive discrimination.[64]   Officer Kwaning is undoubtedly active in alerting the
Prison to instances where he feels he and others, have been wronged.[65]   Many of the grievances
filed by Officer Kwaning do not have any connection with this pending action.   Many of the
grievances are not necessarily grievances.   Officer Kwaning often seeks clarification on certain
policies within the Prison or information relating to certain responsibilities on the job.   These,
like his FMLA claims, are not relevant to our analysis of his hostile work environment claim.

We are left examining grievances concerning Officer Kwaning's treatment, which he
alleges evidence a discriminatory animus towards him.   First, Officer Kwaning submitted a
grievance on May 2, 2011, alleging a sergeant threatened to send him to training because he did
"not understand English language."[66]   Officer Kwaning again submitted grievances in August
and September of 2011 complaining multiple inmates threatened him and as a result he was
removed from his post.[67]   Then, on June 6, 2012, Officer Kwaning submitted a grievance
concerning the rover position in Units 4-7 not being able to sit in a chair while on duty.[68]   On this
same subject, Officer Kwaning filed a follow-up grievance on June 25, 2012, where he
complained the rover duty is discriminating against officers "on the basis of the post they
work."[69]   In August and September 2011, Officer Kwaning filed grievances alleging he had been
retaliated against for filing grievances in the past and as a result CEC removed him from his post
in Unit 2.[70]   Chief of Security Michael Gannon replied to Officer Kwaning informing him the
decision to remove him from Unit 2 was Gannon's own, and was due to complaints regarding his
management of the inmate population.[71]   According to Gannon, he and Officer Kwaning had
discussed the issue before but the allegations continued against Officer Kwaning.[72]   Finally, in
May of 2013, Officer Kwaning submitted grievances concerning a memorandum in his employee
file detailing his removal from Unit 2 due to complaints.   Officer Kwaning requested the

memorandum be removed but the Prison declined to do so citing ongoing litigation.[73]

Aside from the first incident involving Officer Kwaning's alleged inability to understand the English language, we cannot find any of these events, individually or in the aggregate, sufficient to establish a discriminatory intent.

In almost all of the grievances, Officer Kwaning never mentions his race or national origin played a role in any incidents. When Officer Kwaning does mention "discrimination" without a modifier, it cannot reasonably be inferred he is even talking about race or national origin discrimination. As stated earlier, in the June 6 grievance regarding the rover position, Officer Kwaning states the Prison is "discriminating among officers on the basis of the post they work."[74] We cannot find the presence of intentional discrimination against Officer Kwaning.[75] Even considering the actions allegedly directed at others in conjunction with those directed at Officer Kwaning, he cannot to meet the first prong.[76] Officer Kwaning may feel justified in submitting a grievance for each instance of alleged misconduct, but petty slights cannot form the basis of a hostile work environment claim.

Even assuming a discriminatory motive, CEC's alleged conduct did not rise to the severity or pervasiveness required to sustain a hostile work environment claim. The above conduct occurred over a two year time period which we cannot find sufficiently frequent to be considered pervasive.[77] Moreover, the comments directed at Officer Kwaning amount to nothing more than offhand comments and isolated incidents not consistent with a hostile work environment.

Officer Kwaning alleges racist images and comments occurring at the Prison. He alleges two employees found pictures of themselves with nooses around their necks left in their locker.[78] Officer Kwaning alleges Assistant Warden Mario Colluci referred to African American union

board members as Malcolm X, Martin Luther King, Jr., Rosa Parks, and Bethany Shabbazz.[79] Aside from inappropriately citing only to his complaint to support these allegations, Officer Kwaning provides no dates or specific evidence for these incidents.  As CEC argues and Officer Kwaning admitted at oral argument, both instances of employees finding pictures with nooses around their necks occurred before CEC began managing the Prison.

The extraordinarily rude reference to Officer Kwaning's understanding of the English language should be properly disciplined in the Prison.   As CEC knows from the number of cases it faces in this Court, such juvenile conduct has no place in a diverse workplace. It only fosters poor morale and costs attorney's fees.  But, the reference does not constitute severe or pervasive conduct essential for a hostile work environment claim.  The references to American icons such as Dr. Martin Luther King, Malcolm X and Rosa Parks also do not constitute severe or pervasive conduct in this case.  We cannot find an off-hand reference to such influential Americans, even if intended to be pejorative born of ignorance, constitutes an insult let alone severe or pervasive discrimination.

## III.   CONCLUSION

CEC's corrections officers resort to this Court to address perceived discrimination, retaliation and hostile work environment.  We appreciate working as a corrections officer is difficult given the atmosphere and daily pressures.  We expect CEC, facing several lawsuits, may continue to work with the corrections officers' union to forcefully address these issues if only to limit its attorney's fees and improve morale.

Officer Kwaning has not adduced sufficient facts to proceed to a jury on claims of race/national origin discrimination or hostile work environment.  We are not finding CEC "innocent" of such conduct towards its integral corrections officers of color in the Prison, but

only Officer Kwaning has not adduced facts of adverse employment action and severe or pervasive misconduct necessary to proceed to a jury on claims of race and national origin discrimination and hostile work environment under the PHRA.

---

[1] The Court's Policies require that a Statement of Undisputed Material Facts ("SUMF") be filed in support of a Fed.R.Civ.P. 56 motion, as well as an appendix of exhibits or affidavits. CEC filed its SUMF at ECF Doc. No. 37-1 ("CEC SUMF"). CEC filed a "Joint Appendix" at ECF Doc. Nos. 37-2 through 37-9.  Officer Kwaning responded to CEC's SUMF at ECF Doc. No. 43-10 referred to as "Kwaning's SUMF."  Kwaning added documents to the "Joint Appendix" at ECF Doc. Nos. 43-3 through 43-9.  References to exhibits in the appendices shall be referred to by Bates number, for example, "Joint Appendix (J.A.) 1."

[2] (J.A. at 32.)

[3] (*Id.* at 26-27, 29.)

[4] (*Id.* at 30.)

[5] (*Id.* at 65.)

[6] (*Id.* at 63, 84.)

[7] (*Id.* at 69.)

[8] (CEC's SUMF, ¶ 10.)

[9] (*Id.*)

[10] (*Id.* at ¶¶ 8-9.)

[11] (J.A. at 384-85.)

[12] (*Id.* at 384.)

[13] (*Id.*)

[14] (*Id.* at 387-393.)

[15] (*Id.*)

[16] (*Id.* at 408-09.)

[17] (*Id.* at 415.)

[18] (*Id.* at 422-23.)

[19] (*Id.* at 169, 422-23.)

[20] (*Id.* at 170.)

[21] (*Id.* at 172-73, 426.) The resolution of this interaction is not entirely clear from the record. Officer Kwaning testified he never received a write-up and Lieutenant Juisti apologized to him. Further, he testified Lieutenant Pleasant admitted the roll-call doors closed early. Yet, on August 29, 2012, Chief of Prison Security Michael Gannon responded to Officer Kwaning's original grievance and stated he "reviewed the video footage of the start of roll-call and roll call started after 0750 hours, not before as you indicated." (J.A. at 427.) This does not necessarily disprove the Officer Kwaning's assertion that the doors closed early but at least creates uncertainty. Regardless, CEC did not discipline Officer Kwaning.

[22] (*Id.* at 432.)

[23] (*Id.*)

[24] (*Id.* at 451-56.)

[25] (*Id.* at 452.)

[26] (*Id.* at 467.)

[27] (*Id.* at 476.) Officer Kwaning states he submitted the request on December 2, 2013. While the date at the top of the form is December 2, 2013, the "date submitted" is December 3, 2013.

[28] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265

(3d Cir. 2014).

[29] Officer Kwaning references "retaliation" carried out against him for complaining of instances of discrimination.  Our April 8, 2015 Memorandum dismissed any retaliation claim alleged by Officer Kwaning in his Complaint.  We granted Officer Kwaning leave to amend his retaliation claim, if possible, in conformity with Fed.R.Civ.P. 11 and he chose not to do so.  He cannot now argue a claim for retaliation.

[30] *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015). Just as his co-worker Officer Simmons had done (C.A. No. 15-929) through the same counsel, Officer Kwaning pled only PHRA claims.  Since we have diversity jurisdiction, we "construe Title VII and the PHRA consistently." *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006).

[31] 411 U.S. 792 (1973);  *Daniels*, 776 F.3d at 192 (internal citations omitted).

[32] *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325-26 (3d Cir. 2015) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994))

[33] *See Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)

[34] (J.A. at 122.)

[35] (*Id.* at 65.)

[36] (*Id.* at 63.)

[37] (*Id.* at 84.)

[38] (*Id.* at 69.)

[39] (*Id.* at 527-83.)

[40] (*Id.* at 408-09.)

[41] Officer Kwaning's grievance mentions the words "hostilities" and "discrimination."  His response brief would lead us to believe he is complaining of race or national origin discrimination.  However, as Officer Kwaning argues in his opposition, he also filed a follow-up grievance on June 25, 2012. (*Id.* at 415-16.)  In this follow-up grievance, Officer Kwaning is concerned with "the post [officers] work." (*Id.*)  Mr. Kwaning does not mention race or national origin but does characterize CEC's policy as "gender discrimination" because female officers can no longer work on these posts. (*Id.*)

[42] (*Id.*)

[43] *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).

[44] *Rosati v. Colello*, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015 (quoting *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 260 (3d Cir. 2006)).

[45] *Rosati*, 94 F. Supp. 3d at 714.

[46] *See Zielinski v. Pennsylvania State Police*, 108 F. App'x 700, 705-06 (3d Cir. 2006).

[47] *Id.* at 702, 705.

[48] *Id.*

[49] *See Washco v. Federal Express Corp.*, 402 F. Supp. 2d 547, 557 n.7 (E.D. Pa. 2005).

[50] *See Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2014) (finding transfer insufficient adverse employment action in absence of evidence reasonable factfinder could conclude position "is inferior to, rather than merely different from" previous position).

[51] *Id.*; *see also Rosati*, 94 F. Supp. 3d at 714-15 (finding assignment of "extra responsibilities" did not constitute adverse employment action where supported only by "unsupported assertions, speculation, or conclusory allegation").

[52] (J.A. at 151.)

[53] (*Id.* at 384-85.)

[54] *Yarnall v. Philadelphia Sch. Dist.*, 57 F. Supp. 3d 410, 419 (E.D. Pa. 2014).

[55] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

[56] *See Caver v. City of Trenton*, 420 F.3d 243, 546 (3d Cir. 2005).

[57] *Velez v. QVC*, 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002).

[58] *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (citation omitted).

[59] *Mufti v. Aarsand & Co., Inc.*, 667 F. Supp. 2d 535, 545 (W.D. Pa. 2009) (citation omitted).

[60] *Funayama v. Nichia Am. Corp.*, No. 08-5599, 2011 WL 1399844, *11 (E.D. Pa. Apr. 13, 2011).

[61] (ECF Doc. No. 37, at 13-14.)

[62] (*Id.*)

[63] *See Caver*, 420 F.3d at 546.

17

[64] CEC argues many of the events occurring prior to January 23, 2013—180 days prior to Officer Kwaning's PHRA charge—should not be considered as they are time barred. While this argument is alluring, as Officer Kwaning includes many incidents occurring before this date or provides no dates at all. We need not discuss this issue because we find Officer Kwaning's claims fail on the merits.

[65] (J.A. at 379-526 (compilation of Officer Kwaning's grievances to Prison))

[66] (*Id.* at 384.)

[67] (*Id.* at 387-93.)

[68] (*Id.* at 408-09.)

[69] (*Id.* at 415.)

[70] (*Id.* at 421-26.)

[71] (*Id.* at 428.)

[72] (*Id.*)

[73] (*Id.* at 451-56.)

[74] (*Id.* at 415.)

[75] See *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008) (finding plaintiff "cannot sustain a claim [of hostile work environment] simply by asserting an event and then asserting it was motivated by racial bias").

[76] See *Mufti*, 667 F. Supp. 2d at 545.

[77] See *Davis v. City of Newark*, No. 04-5317, 2006 WL 2583074, *7 (D.N.J. Sept. 6, 2006) (finding incidents occurring over ten year period insufficient); *Gharzouzi v. Northwestern Human Servs.*, 225 F. Supp. 2d 514, 536 (E.D. Pa. 2002) (finding six incidents over three months insufficient).

[78] (ECF Doc. No. 43-1, at 14.)

[79] (*Id.* at 15.)